IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| UNICITY INTERNATIONAL, INC., a Delaware Corporation,<br><br>           Plaintiff,<br><br>vs.<br><br>JAMES MOYLES, an individual, FIRST FLORIDA BUSINESS CONSULTANTS, INC., a Florida Corporation, and DOES 1–20,<br><br>           Defendants. | **MEMORANDUM DECISION AND ORDER DENYING MOTION TO STRIKE; GRANTING IN PART AND DENYING IN PART UNICITY'S MOTION FOR SUMMARY JUDGMENT; AND GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:16-cv-00766<br><br>Judge Clark Waddoups |
| FIRST FLORIDA BUSINESS CONSULTANTS, INC., a Florida Corporation,<br><br>           Counterclaimant,<br><br>vs.<br><br>UNICITY INTERNATIONAL, INC., a Delaware Corporation,<br><br>           Counter-Defendant. | |

Before the court are three motions: (1) Plaintiff Unicity's Motion for Summary Judgment, (ECF No. 116); (2) Defendants' Motion for Summary Judgment, (ECF No. 118); and (3) Defendants' Motion to Strike, (ECF No. 153). As explained below, the court GRANTS in part and DENIES in part Unicity's Motion for Summary Judgment, (ECF No. 116); GRANTS in part and DENIES in part Defendants' Motion for Summary Judgment, (ECF No. 118) and DENIES Defendants' Motion to Strike, (ECF No. 153.)

## Undisputed Facts

1. First Florida Business Consultants, Inc. ("First Florida") "is a single-shareholder corporation of which Moyles is the sole shareholder, officer, and director." (*Compare* ECF No. 116 at 9 *with* ECF No. 132 at 4.)

2. "In about 1991, [First Florida] entered into a Distributor Agreement with Rexall Showcase International, a predecessor-in-interest to Unicity. (*Compare* ECF No. 116 at 9 *with* ECF No. 132 at 5.[1])

3. Prior to 2007, First Florida's "Distributor Agreement with Rexall Showcase International was assigned to Unicity, and [First Florida] became a Unicity distributor." (*Compare* ECF No. 116 at 9 *with* ECF No. 132 at 4–5.)

4. "As a Unicity distributor, [First Florida] agreed to follow Unicity's Policies & Procedures, as amended from time to time." (*Compare* ECF No. 116 at 9 *with* ECF No. 132 at 4–5.)

5. There is no genuine dispute that "Section 1.F in all versions of Unicity's Policies & Procedures for the United States in effect from January 15, 2010, through April 30, 2016, provided that '[a]ny person … who has acted or represented themselves to be a Distributor or beneficiary of a Distributorship and thereby obtained any beneficial interest or presumption of a beneficial interest in a Unicity Distributorship is a Distributor and is bound by the duties and obligations of the Contract.'" (*Compare* ECF No. 116 at 9 *with* ECF No. 132 at 5–6.)

6. "The capitalized term 'Contract' in the Policies & Procedures refers to the Unicity Award Plan, Distributor Agreement, and Policies & Procedures." (*Compare* ECF No. 116 at 10 *with* ECF No. 132 at 5–6.)

7. There is no genuine dispute that "[u]nder Section 2.D in Unicity's Policies & Procedures, a beneficial interest in a Unicity distributorship includes being an owner, partner, shareholder,

[1] Neither party has produced a signed copy of the 1991 Rexall Agreement, but Defendants acknowledge that Mr. Moyles did sign it. (*See* ECF No. 132 at 5 ("Defendants acknowledge that Moyles signed a similar document in or about 1991 on behalf of [First Florida] . . . .").)

member, officer, director, trustee, or beneficiary of any entity that may be a Unicity distributorship, or a direct or indirect participant in any partnership, corporation, trust, or other entity that may be a Unicity distributorship." (*Compare* ECF No. 132 at 10 *with* ECF No. 132 at 6.)

8. "Moyles referred to himself as a Unicity distributor." (*Compare* ECF No. 116 at 10 *with* ECF No. 132 at 6.)

9. In a "Unicity Publication" from "Spring 2003" entitled "Ulife," Unicity promoted Moyles by describing the income *he* earned from his "franchise" with Unicity. (*See* ECF No. 70-2 at 2, 6 ("Jim began **his** franchise 16 years ago part time . . . 'It became a full-time endeavor after about six months. **My** 12th check was more than $13,000.'") (bold added).)

10. "Under Section 3.A. of Unicity's Policies and Procedures, a distributor is required to comply with all 'contractual obligations' with Unicity." (*Compare* ECF No. 116 at 11 *with* ECF No. 132 at 8–9.)

11. On June 17, 2007, Mr. Moyles signed a Recognition and Marketing (RMA) Agreement. (*See* ECF No. 117-1 at 2.) The RMA Agreement authorized Unicity to use Moyles' image and promotional material. (ECF No. 118 at 12.)

12. Under the terms of the RMA Agreement, Mr. Moyles agreed to "adhere and follow the terms of [the] Distributor Agreement and Distributor Policies and Procedures." (ECF No. 117-1 at 1.)

13. On July 1, 2009, James Moyle signed an "Additional Franchise Position Application." (ECF No. 115-32 at 1.)

14. Under a section entitled "Distributor Information," the Additional Franchise Position Application contains "Distributor ID Number" "5427201," James Moyle's signature, and over a section entitled "Business Name, if applicable," the words "First Florida." (ECF No. 115-32 at 1.)

15. It is undisputed that James Moyles' signing of the Additional Franchise Position Agreement in 2009 "led to the creation of the Unicity distributorship assigned identification number 105971601." (*Compare* ECF No. 116 at 11 *with* ECF No. 132 at 9.)

16. It is undisputed that "[a]fter signing the [Additional Franchise Position Agreement] and while the additional franchise it created was still in place, Moyles and [First Florida] directly or indirectly participated in Jusuru, another direct selling, network marketing, or multi-level opportunity." (*Compare* ECF No. 116 at 11 *with* ECF No. 132 at 9.)

17. It is undisputed that "[o]n or about June 2, 2010, Moyles directed Elaine Wise (Wise), an existing Jusuru distributor, to complete an online enrollment application for a new Jusuru distributorship using a computer in [First Florida's] office." "Moyles directed Wise to put the distributorship in the name of his daughter, Ashley Germain (Ashely), but had Wise use Moyles' (rather than Ashley's) office phone number, email address, and credit card number on the enrollment application. In approximately October 2014, nominal ownership of that distributorship was transferred to Hi Beautiful, Inc. (Hi Beautiful)—a corporation in which Ashley was the sole shareholder." (*Compare* ECF No. 116 at 11–12 *with* ECF No. 132 at 9.)

18. It is undisputed that "[i]n approximately October 2011, Moyles negotiated with Jusuru for the creation of a second distributorship, which was nominally owed by Druid Road Investments Inc. (DRI)—an entity in which his son Michael Sean Moyles (Sean) was the sole shareholder. Moyles also negotiated with Jusuru to have the DRI distributorship placed upline to the Ashley distributorship." (*Compare* ECF No. 116 at 12 *with* ECF No. 132 at 9.)

19. There is no genuine dispute that "[a]lthough the Jusuru distributorships were nominally held by Ashley (later Hi Beautiful) and [Druid Road Investments] Jusuru and many of its distributors considered Moyles to be the person who actually held, operated, and represented the distributorships." (*Compare* ECF No. 116 at 12 *with* ECF No. 132 at 9.)

20. It is undisputed that "[o]n multiple occasions, Moyles referred to the Ashley, Hi Beautiful, and [Druid Road Investments] Jusuru distributorships as his distributorships and the downline organizations of those distributorships as his downline." (*Compare* ECF No. 116 at 12–13 *with* ECF No. 132 at 9–10.)

21. It is undisputed that "[t]he 'Genesis Global Group' was a name that Moyles and others used to refer to Jusuru distributors who were in the downlines of the Ashley, Hi Beautiful, and [Druid Road Investments] Jusuru distributorships. Moyles was the leader of the Genesis Global Group, and members of that group referred to him by pseudonyms such as 'Beacon 1,' 'Tampa Enterprise,' and 'Tampa's Beacon 1 Team Leader.'" (*Compare* ECF No. 116 at 13 *with* ECF No. 132 at 9–10.)

22. It is undisputed that "[b]eginning with the creation of the Ashley Jusuru distributorship in June 2010, Moyles actively participated in high-level Jusuru leadership committees, including its Presidential Circle reserved for Jusuru's top distributors, and on multiple occasions he helped with revisions to Jusuru's compensation plan." (*Compare* ECF No. 116 at 13 *with* ECF No. 132 at 9–10.)

23. It is undisputed that "Moyles often worked with Jusuru's top distributors and Jusuru's corporate office to develop marketing tools that Jusuru distributors could use to recruit new distributors." (*Compare* ECF No. 116 at 13 *with* ECF No. 132 at 9–10.)

24. It is undisputed that "Moyles had regular communications by email and phone with Jusuru employees and corporate officers between June 2010 and 2016, including daily to weekly phone calls with Jusuru's president, Asma Ishaq (Ishaq)." "For example, between October 2014 and December 2016 there were at least 76 phone calls between James Moyles' office phone number at [First Florida] and Jusuru's corporate office for a total talk time of nearly 7 hours and 17 minutes, and at least 176 phone calls between James Moyles' cell phone

number and Jusuru's corporate offices for a total talk time of more than 22 hours and 12 minutes." (*Compare* ECF No. 116 at 13–14 *with* ECF No. 132 at 9–10.)

25. It is undisputed that "[i]n correspondence with Ishaq, Moyles boasted in October 2012 that he was the only person 'who actually has built more than 2 large legs' at Jusuru." "David Ciemny, Jusuru's former vice-president of business development, estimates that 75-80% of all Jusuru distributors were in the downline of the Hi Beautiful distributorship prior to its termination in April 2016." "In an April 2016 letter to Jusuru, Sean [Moyles] asserted that the Hi Beautiful and [Druid Road Investment] distributorships 'account for close to ninety percent of Jusuru's business.'" (*Compare* ECF No. 116 at 14 *with* ECF No. 132 at 9–10.)

26. It is undisputed that "Moyles attended each of Jusuru's annual 'Rise to Enterprise' conventions from 2011 through 2015, participated in events at those conventions reserved for Jusuru's top distributors, and made presentations—including appearing on the main stage at Jusuru's September 2014 convention to endorse Jusuru as a company and its new compensation plan." "As with other top-level distributors, Jusuru would make travel arrangements for Moyles to attend these events and provided Moyles with other perks reserved for Jusuru's leaders." "Moyles avoided cameras at these events because he didn't think Unicity would appreciate his visibility at Jusuru events." (*Compare* ECF No. 116 at 14 *with* ECF No. 132 at 9–10.)

27. It is undisputed that "Moyles actively recruited individuals to join Jusuru by inviting and encouraging people he knew to become Jusuru distributors, participating in three-way phone calls with prospective Jusuru distributors to encourage them to join Jusuru, hosting weekly networking or business opportunity meetings at [First Florida's] office during which Moyles would often give presentation about the Jusuru business opportunity, traveling to West Palm Beach to participate in business opportunity meetings hosted by his sister Barbara Heilman, preparing PowerPoint presentations to be used at the networking and business opportunity

meetings he and others conducted, and helping prospective distributors complete and submit applications to join Jusuru." (*Compare* ECF No. 116 at 14–15 *with* ECF No. 132 at 9–10.)

28. It is undisputed that "Moyles actively participated in training Jusuru distributors. He conducted and attended a substantial number of training meetings for Jusuru distributors, some of which were held on Saturdays and lasted several hours and others of which were held in [First Florida's] office; created the training manuals and other training materials for the Genesis Global Group, which were separate from the training materials provided by Jusuru's corporate office; taught Jusuru distributors the 'secrets' and 'steps' to building a million-dollar Jusuru business; and customized scripts for individual Jusuru distributors to use in their recruiting efforts." (*Compare* ECF No. 116 at 15 *with* ECF No. 132 at 9–10.)

29. It is undisputed that "Moyles helped integrate new Jusuru distributors into the Genesis Global Group by writing them a welcome letter, helping them understand the training system he had created and how it worked, and then continuing to correspond with them by email using lists maintained by [First Florida] employees." (*Compare* ECF No. 116 at 16 *with* ECF No. 132 at 9–10.)

30. It is undisputed that "[a]s part of their job responsibilities, [First Florida] employees helped Moyles operate the Ashley, Hi Beautiful, and DRI Jusuru distributorships by performing such tasks as helping prepare and distribute PowerPoint presentations and training materials for Jusuru recruitment meetings and training events, maintaining updated versions of Jusuru-related PowerPoint presentations and training materials on a Google drive and an internet website that could be accessed by members of the Genesis Global Group, preparing Jusuru-related newsletters and incentive letters, drafting and editing Jusuru-related documents and correspondence for Moyles, preparing Jusuru meeting agendas, receiving RSVPs for Jusuru meetings, preparing and copying documents for Jusuru meetings, reserving locations and ordering food for Jusuru meetings, maintaining lists of email addresses and other information

for Jusuru distributors, sending out Jusuru-related emails and meeting invitations to downline distributors, answering Jusuru-related questions, helping Jusuru distributors navigate the Jusuru website, and placing product orders for Jusuru distributors." (*Compare* ECF No. 116 at 16 *with* ECF No. 132 at 9–10.)

31. It is undisputed that "[a]t the end of each month, Moyles would access the online account (known as the 'back office') for the Ashley, Hi Beautiful, and [Druid Road Investments] Jusuru distributorships; use his credit card to force qualify those distributorship and other distributorships in their downlines for commission payments by buying Jusuru product on those distributors' accounts; and then get reimbursed by the Ashley, Hi Beautiful, and DRI Jusuru businesses for those purchases, even though Moyles or [First Florida] received and used the product being purchased" (*Compare* ECF No. 116 at 17 *with* ECF No. 132 at 9–10.)

32. It is undisputed that "[First Florida] maintained the books and records for the Ashley, Hi Beautiful, and [Druid Road Investments] Jusuru distributorships; prepared checks written on their bank accounts per Moyles' instructions; and was paid at least $7,850.00 for these services." (*Compare* ECF No. 116 at 17 *with* ECF No. 132 at 9–10.)

33. There is no genuine dispute that "[b]etween February 17, 2011, and October 26, 2015, Moyles received a total of $111,308.19 in direct payments through checks drawn from the bank accounts of the Ashley, Hi Beautiful, and [Druid Road Investment] Jusuru distributorships that were characterized in the QuickBooks records maintained for those distributorships by [a First Florida] employee . . . ." (*Compare* ECF No. 116 at 17 *with* ECF No. 132 at 10.)

34. There is no genuine dispute that "[b]etween December 31, 2013, and February 29, 2016, Moyles received a total of $494,700.00 in direct payments through checks drawn from the bank accounts for the Ashley, Hi Beautiful, and [Druid Road Investment] Jusuru distributorships that a [First Florida] employee contemporaneously characterized in the

QuickBooks records for these Jusuru distributorships . . . as consulting fees, professional

fees, or outside service payments." (*Compare* ECF No. 116 at 18 *with* ECF No. 132 at 10–

11.)

35. There is no genuine dispute that "[o]n January 7, 2014, [a First Florida] employee prepared a

check for $82,000.00 drawn from the bank account for the Ashley Jusuru distributorship that

was made payable to a car dealership to pay the full purchase price for a new Porsche for

Moyles. The [First Florida] employee contemporaneously recorded this payment as a

consulting fee in the Quick Books records for the Ashley Jusuru distributorship, and she

booked the Porsche as an asset of [First Florida] in [First Florida's] accounting records."

(*Compare* ECF No. 116 at 18 *with* ECF No. 132 at 11.)

36. There is no genuine dispute that "[b]etween August 5, 2015, and January 5, 2017, [a First

Florida] employee used a total of $58,107.88 in funds from the bank account for the Hi

Beautiful Jusuru distributorship to make payments directly to Capital One to pay off the

balance owing on credit card statements for Moyles' personal Capital One credit card."

(*Compare* ECF No. 116 at 18 *with* ECF No. 132 at 11.)

37. There is no genuine dispute that "[o]n December 31, 2015 [a First Florida] employee

prepared checks totaling $11, 268.20 drawn from the bank accounts of the Hi Beautiful and

[Druid Road Investment] Jusuru distributorships and made payable to [First Florida] to

reimburse [First Florida] for payments it made on Moyles' personal credit cards." (*Compare*

ECF No. 116 at 19 *with* ECF No. 132 at 12.)

38. There is no dispute that "[t]he Ashley Jusuru distributorship paid [First Florida] $10,075.00

in October 2011 as reimbursement for 775 hours that [First Florida] employee Lillian

Schemadovits-Norris spent working for the Ashley Jusuru distributorship during the first 10

months of 2011." "Schemadovits-Norris helped prepare the Jusuru PowerPoint presentations

that Moyles used, handled Moyles' Jusuru-related correspondence, and worked with local Jusuru distributors." (*Compare* ECF No. 116 at 19 *with* ECF No. 132 at 12.)

39. There is no dispute that "[o]n January 13, 2012, Unicity sent Moyles a letter notifying him that it had received information that he might be involved in a competing network marketing opportunity with Jusuru, in violation of the AFP agreement and Unicity's Policies & Procedures. Unicity asked Moyles to provide a written response to these allegations." (*Compare* ECF No. 116 at 19 *with* ECF No. 132 at 12.)

40. There is no dispute that "Moyles emailed a response to Unicity on January 19, 2012, in which he stated: 'I can assure you that I am not a distributor of Jusuru or any network marketing company other than Unicity. To be candid, my daughter, Ashley Germain, is a distributor in that company and while I have given her counsel and advice as any father would, and her brother and I have even made the conference room in our office available to her, I have received no remuneration or profited in any way from her or anyone else in the company.'" (*Compare* ECF No. 116 at 19 *with* ECF No. 132 at 12.)

41. There is no dispute that "[o]n September 30, 2014, Moyles sent an email to Unicity's then-CEO, Stewart Hughes (Hughes), in which he asked Hughes for permission to help his daughter, Ashley, in growing her Jusuru business. Moyles acknowledged that doing so would conflict with his obligations under the AFP agreement.[2]"

42. There is no dispute that "Hughes responded to Moyles' email on October 2, 2014, and stated: 'I'm uncomfortable acquiescing to your request. You have been so visible over the years with us that the question (What is Jim doing with that other company?) would be a major distraction. I would need to have assurances that you are not, in any way, being compensated

---

[2] *See* ECF No. 115-34 at 2 ("As you know, she is a Jusuru distributor. She loves their skin care products and their plan and would like my help in growing her business. Can I have your okay on this? *I realize this would conflict with the AFP position*. The income from the AFP is small and I am willing to give that up, if you prefer.").)

for your service to your daughter and her downline.'" (*Compare* ECF No. 116 at 20 *with* ECF No. 132 at 12.)

43. There is no dispute that "Moyles wrote back to Hughes on October 22, 2014, and stated: 'I assure you that if I had your okay, I would make it clear that I'm only helping my daughter, Ashley, with training and support. I would also make it clear that I am with another company, Unicity, and that I am not, nor have I ever been a Jusuru distributor. Since I would like to help her in a fashion that would not be in conflict with my distributor agreement and not be interpreted as conflicting with the [Additional Franchise Position] agreement, in order to help her with training six months from now, please treat this email as my resignation from the AFP position.'" (*Compare* ECF No. 116 at 20 *with* ECF No. 132 at 12; ECF No. 115-34 at 1.)

44. There is no dispute that Mr. Moyles continued to receive Additional Franchise Position payments and did not reject those payments. (ECF No. 115-18 at 323.)

45. On January 17, 2015 Mr. Moyles inadvertently cc'd a Unicity employee on an email that referenced his involvement in Jusuru meetings. (ECF No. 117-16 at 1.)

46. On January 19, 2015, that Unicity employee sent an email to Kara Miller, Unicity's Supervisor of Distributor Compliance, that provided: "This was really weird . . . I got an email from Jim Moyles. Sounds like he is also in another MLM? I don't know if --that's a problem or not." (ECF No. 117-16 at 1.)

47. There is no dispute that "[i]n the latter part of 2015, Unicity received an anonymous letter stating Moyles had been actively working with another multi-level marketing company since 2010 and detailing Moyles' alleged activities with Jusuru." (*Compare* ECF No. 116 at 20 *with* ECF No. 132 at 12; ECF No. 115-34 at 1.)

48. There is no dispute that Kara Miller drafted a letter in March of 2015 that was not sent to Mr. Moyles. That draft letter provided, in part, that Mr. Moyles' involvement in Jusuru "is in violation of your Additional Franchise Position . . . Agreement." (ECF No. 117-17 at 1.)

49. There is no dispute that "[o]n January 28, 2016, Unicity sent Moyles and [First Florida] a letter notifying them that both of their Unicity distributorships (numbers 5427201 and 105971601) had been suspended pending the outcome of Unicity's investigation into the allegations it had received that Moyles was directly or indirectly involved in Jusuru. As part of its investigation, Unicity asked Moyles to respond to a series of questions relating to the allegations Unicity had received." (*Compare* ECF No. 116 at 20 *with* ECF No 132 at 12.)

50. There is no dispute that "[o]n February 5, 2016, Moyles sent an email to Kara Miller, in which he stated that 'out of respect for [Hughes'] concerns, I have shown no visibility with the other company. I have not participated in any of their training calls or webinars and have not created a distraction nor have I received compensation." (*Compare* ECF No. 116 at 21 *with* ECF No 132 at 12.)

51. It is undisputed that "Moyles sent another email to Kara Miller on February 5, 2016, in which he asserted that neither he nor any company in which he owned an interest had been a Jusuru distributor or 'received a commission or payment from them or anyone else.' Moyles further stated: 'I also have not been a presenter of any Jusuru event other than to share general MLM insights, where I identified myself as a Unicity/Bios Life distributor, while being proud of my daughter's success.'" (*Compare* ECF No. 116 at 21 *with* ECF No 132 at 12.)

52. It is undisputed that "[o]n February 12, 2016, Moyles sent another email to Kara Miller in which he provided answers to the questions Unicity asked in the January 28 suspension letter. Moyles described his involvement with Jusuru as limited to being 'a coach and advisor' to Ashley, Sean, and his sisters; asserted he had only 'spoken or presented in any manner' at one Jusuru event; represented he had 'received no commissions or payments from

Jusuru'; and represented he had never attended any of the Jusuru corporate conferences held in West Palm Beach." (*Compare* ECF No. 116 at 21 *with* ECF No 132 at 12.)

53. It is undisputed that "[i]n April 2016, Unicity terminated Moyles and FFBC's Unicity distributorships and notified them that it was also electing not to renew those distributorships." (*Compare* ECF No. 116 at 21 *with* ECF No 132 at 12.)

54. It is undisputed that "[u]nder the Unicity Policies & Procedures in effect in April 2016, the Distributor Agreement between Unicity and each of its distributors had to be renewed on an annual basis, and Unicity had discretion to decline to renew a Distributor Agreement, which would result in termination of the distributorship created by the Distributor Agreement. August 29 of each year was the annual renewal date for Moyles and [First Florida's] Distributor Agreement." (*Compare* ECF No. 116 at 21–22 *with with* ECF No 132 at 12.)

55. It is undisputed that "Unicity paid commissions under the terms of its compensation plan to [First Florida] for the distributorships assigned identification numbers 5427201 and 105971601 each month until Unicity suspended those distributorships. Between June 15, 2010, and January 15, 2016, those commission payments totaled $1,652,428.63 for distributorship number 5427201 and $28,976.16 for distributorship number 105971601, for a grand total of $1,681,404.79." (*Compare* ECF No. 116 at 22 *with with* ECF No 132 at 12.)

56. It is undisputed that "[u]nder Unicity's Policies & Procedures, Unicity was not required to pay commissions to Moyles and [First Florida's] distributorships during the period of their suspension." (*Compare* ECF No. 116 at 22 *with* ECF No 132 at 12.)

57. It is undisputed that "[u]nder its Policies & Procedures and the terms of the Distributor Agreement, Unicity may terminate a distributor for materially breaching the Distributor Agreement, Policies & Procedures, or any other agreement the distributor has with Unicity. Failing to cooperate with a Unicity investigation constitutes a material breach." (*Compare* ECF No. 116 at 22 *with* ECF No 132 at 12.)

58. It is undisputed that "[u]nder Unicity's Policies & Procedures, a terminated distributor 'loses all rights to the existing Downline and is no longer entitled to receive any Awards whatsoever, already earned or otherwise, from Unicity, nor is the Distributor entitled to any other claim for indemnification with regard to the loss of his or her Customer base or any investments made.'" (*Compare* ECF No. 116 at 22 *with* ECF No 132 at 12.)

59. There is no genuine dispute that "[u]nder its Policies & Procedures, Unicity is not liable to FFBC 'for any damages in excess of an amount equal to six times the monthly commissions of [FFBC], based upon [FFBC's] average commissions over the previous twelve months.' With the sole exception of the foregoing, Unicity is not liable to FFBC 'for any consequential, incidental, direct, indirect, special, contingent, or punitive damages whatsoever, including, without limitation, lost profits.'" (*Compare* ECF No. 116 at 23 *with* ECF No 132 at 12.)

## **Summary Judgment Standard**

Summary judgment is proper when the moving party demonstrates that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The court must "view the evidence and draw reasonable inferences therefrom in a light most favorable to the nonmoving party." *Commercial Union Ins. Co. v. Sea Harvest Seafood Co.*, 251 F.3d 1294, 1298 (10th Cir. 2001).

## **Analysis**

As an initial matter, the court notes that it requested the parties to submit supplemental briefing addressing the effect of the economic loss rule on Unicity's tort claims. Without considering the governing choice of law rules, Defendants argued that under Utah law "[t]he economic loss rule is a complete bar to Unicity's fraud claim and other tort claims in this case." (ECF No. 148 at 8.) In response, Unicity argued that under the governing "most significant

relationship test," Florida law controls, and argued that under Florida law, the economic loss rule only applies in the products liability context. (ECF No. 151 at 8.) Defendants filed a Motion to Strike Portions of Unicity's Supplemental Response. The court agrees that Florida law governs, and agrees that the economic loss rule does not bar Unicity's fraud claim. The court declines to strike any portion of Unicity's Response to Defendants' Supplemental Brief—therefore Defendants' Motion to Strike, (ECF No. 153) is DENIED.

Having satisfied itself that the economic loss rule does not bar Unicity's tort claims, the court turns to the parties' cross motions for summary judgment. In their Motion for Summary Judgment, Defendants seek "dismissal of **all** of Unicity's Claims for Relief . . . ." (ECF No. 118 at 5 (emphasis in original).) Unicity "moves for summary judgment, in whole or in part, against James Moyles . . . and First Florida" on Unicity's breach of contract claims; Unicity's fraud claim; First Florida's counterclaim of contract and breach of the covenant of good faith and fair dealing; and First Florida's declaratory judgment claim. (ECF No. 116 at 6–7.)

The court addresses (I) the parties' cross motions on Unicity's breach of contract claims, (II) Defendants' affirmative motion that Unicity's claims should be dismissed because Unicity did not sustain any damages, (III) Unicity's motion for partial summary judgment on its fraud claim; (IV) Unicity's Motion for Summary Judgment on First Florida's Counterclaim for breach of contract and breach of covenant of fair dealing; (V) Unicity's Motion for Summary Judgment on First Florida's Motion for Declaratory Judgment; (VI) Unicity's unjust enrichment claim; and (VII) Defendants' secondary RMA arguments.

    I.      <u>Unicity's Breach of Contract Claim</u>

"Unicity requests the entry of summary judgment in its favor on its claims against Moyles for breach of two contracts: the Distributor Agreement and the AFP agreement." (ECF No. 116 at 23.) In both their Opposition and their Affirmative Motion, Defendants make several arguments supporting their position that Unicity is precluded from an entry of summary judgment on their breach of contract claim. The court addresses Defendants' arguments.

A.   Defendants' Arguments Against Unicity's Breach of Contract Claim

In their Opposition to Unicity's Motion, Defendants argue that the court should deny Unicity's Motion seeking summary judgment of its breach of the Distributor Agreement and AFP Agreement for six reasons. The court need only address four: (1) Mr. Moyles was not bound by any contracts with Unicity; (2) the AFP Agreement lacked consideration; (3) Mr. Moyles terminated the AFP Agreement on October 22, 2014; (4) the breach of contract claims are barred by a one year contractual limitation provision.

1.   Mr. Moyles Was Personally Bound

Defendants argue that "Moyles was not personally bound by any contracts with Unicity." (ECF No. 132 at 27.) "Defendants acknowledge that Moyles was the individual who executed both the Distributor Agreement and the [Additional Franchise Position] agreement, [but] Defendants contend that he only did so as the authorized representative of [First Florida]." (ECF No. 132 at 27.) Defendants argue that "[t]here is nothing in the agreements that were signed by Moyles which suggests that Moyles was a party to the agreements, that he was a Unicity distributor, or that he was personally bound by the agreements." (ECF No. 132 at 28.)

Defendants' arguments relate to two contracts—the Distributor Agreement and the Additional Franchise Position agreement. The Additional Franchise Position Agreement was

signed in 2009. A copy of the July 1, 2009, Additional Franchise Position Agreement bearing James Moyles' signature has been submitted to the court. (*See* ECF No. 115-32 at 1.)

As Defendants point out, "Unicity has failed to produce a signed copy of the" 1991 Distributor Agreement. (ECF No. 132 at 4.) As Defendants argue, "[t]he only version of this agreement that has been produced in this case is a blank and unsigned copy." (ECF No. 132 at 4; *see also* ECF No. 70-1 at 2–3; *see also* ECF No. 117-4 at 1–3.) But Mr. Moyles concedes that "when [he] signed up with Rexall, [he] signed a distributor agreement" (ECF No. 115-18 at 180–181) "in or about 1991 on or behalf of" First Florida that was a "similar document" to the document that has been produced in this case. (*See* ECF No. 132 at 5.) And, importantly here, "Defendants do not dispute that ***Moyles***," "in August of 1991," "executed an Application and Agreement on behalf of [First Florida] which was similar, if not identical to" the blank form that has been produced in this case. (ECF No. 118 at 8–9 n. 2.)

Thus, there is no genuine dispute that Moyles signed an identical version of the blank form that has been produced in this case. As Unicity argues, "[t]he backside of [the Rexall] agreement he signed states it was 'between the applicant and RSI' . . . ." (ECF No. 141 at 20 (quoting ECF No. 131-8 at 1.) Unicity argues that under Utah law, "where it is not clear that a corporate officer signs a contract in a representative capacity, he is personally liable." (ECF No. 141 at 19 (quoting *Boise Cascade Corp., Bldg. Materials Distribution Div. v. Stonewood Dev. Corp.*, 655 P.2d 668, 669 (Utah 1982)). The Utah Supreme Court has provided that: "The basic rule of personal responsibility on contracts is declared and applied in *Mortgage Investment Co. v. Toone*, 17 Utah 2d 152, 153-54, 406 P.2d 30, 31 (1965), as follows:"

> (T)he contract names the defendant as purchaser, and he personally signed it without indicating that he was an agent acting for a principal. He is therefore personally bound by the contract which he signed in his individual capacity.

*Anderson v. Gardner*, 647 P.2d 3, 4 (Utah 1982) (quoting *Toone*, 406 P.2d at 31)).

Because Moyles signed the Additional Franchise Position Agreement, and did not make clear that he was signing it in his representative capacity, the court agrees with Unicity that Moyles is personally liable for any breach of that Agreement. The court also agrees with Unicity that because Moyles concedes that he signed the 1991 Distributor Agreement, and has provided no admissible evidence that he made clear that he was signing it in his representative capacity, he is personally liable for any breach of that Agreement as well.

The court holds that both the Additional Franchise Position Agreement and the Distributor Agreement were valid contracts between Unicity and Moyles/First Florida.

2.   Consideration

Defendants argue that the Additional Franchise Position Agreement "was void and unenforceable because it lacked any consideration." (ECF No. 132 at 17.) This is so, Defendants argue, because "simply by achieving the rank of Presidential Diamond and being a member of the President's Club, [First Florida] was entitled to the" Additional Franchise Position. (ECF No. 132 at 19.)

The Additional Franchise Position Application that James Moyle signed on July 1, 2009, provided, in relevant part:

> I also agree that for the special consideration, I will not participate directly or indirectly, in any other direct selling, network marketing, or multi-level opportunity for as long as I have the Additional Franchise Position and six (6) months following the termination of this position.

(ECF No. 117-2 at 1.) Both parties agree that "[t]he version of Unicity's Policies and Procedures that were in effect on July 1, 2009 were the Policies & Procedures that had been implemented by Unicity on January 1, 2007." (ECF No. 132 at 18; *see also* ECF No. 141 at 10.) The Unicity Policies and Procedures implemented on January 1, 2007, provided, in relevant part:

> Presidential Diamonds who are members of the President's Club have the unique and exciting **opportunity** to create an Additional Franchise Position . . . This position is a new Distributorship to the qualifying Distributor that is placed on the Distributor's Frontline.  The qualifying Distributor may move existing Legs, other than the four (4) largest Legs measured in terms of OV, under the AFP.  The AFP must meet all the separate qualification requirements necessary to earn Awards at any specific Rank in the Compensation Plan.  An AFP that qualifies for membership in the President's Club as a Presidential Diamond has the right to create yet another Additional Franchise Position.

(ECF No. 133-2 at 32 (bold added).) Defendants argue that by the express terms of the governing Unicity Policies and Procedures, the Additional Franchise Position "was awarded to a Unicity distributor simply by virtue of achieving the rank of Presidential Diamond." (ECF No. 132 at 19.)

In response to this argument, Unicity makes two arguments. First, it argues that Defendants "waived the defense of lack of consideration by failing to timely raise it." (ECF No. 141 at 9.) Second, it argues that "there is no genuine dispute that Unicity provided consideration for the promises it received from [Defendants] in the" Additional Franchise Position Agreement. (ECF No. 141 at 9.) As explained below, because the court agrees with Unicity that there is no genuine dispute that Unicity provided consideration, the court does not address Unicity's waiver argument.

Unicity argues that "the undisputed facts demonstrate that the necessary consideration to form a contract existed when Moyles signed the" Additional Franchise Position Agreement.

(ECF No. 141 at 9.) Unicity argues that the language of the governing 2007 version of Unicity's Policies and Procedures "did not, as Moyles and [First Florida] assert, create a legal obligation on the part of Unicity to give Moyles and [First Florida] an additional distributorship position merely because they achieved the rank of Presidential Diamond." (ECF No. 141 at 10.) Unicity argues that "[t]he cited language in the [governing] Policies & Procedures stating that Presidential Diamonds have the **opportunity** to create an additional distributorship position did not preclude Unicity from requiring some additional consideration in return for the realization of that possibility." (ECF No. 141 at 10 (bold added).)

Unicity argues that the uncontroverted evidence demonstrates that "although achieving the rank of Presidential Diamond qualified a distributor for the *opportunity* to *apply* for an additional distributorship position, Unicity did not grant the additional distributorship to a Presidential Diamond unless he signed the [Additional Franchise Position Agreement] and promised not to participate directly or indirectly in any other direct selling, network marketing, or multi-level opportunity." (ECF No. 141 at 10 (emphases in original).) Here, Unicity cites to testimony of Unicity's former CEO and a Unicity distributor to support the proposition that Unicity always required a distributor to sign an Additional Franchise Position Agreement prior to creating an additional distributorship position. (*See* ECF No. 141 at 10.)

The court agrees with Unicity that there is no genuine dispute that Unicity provided consideration to Moyles in the form of allowing him to create an additional distributorship. Defendants have pointed to no evidence demonstrating that the governing 2007 version of Unicity's Policies and Procedures automatically led to the creation of an additional distributorship. Defendants' consideration argument fails.

3. Mr. Moyles' Resignation Did Not Terminate the AFP

Defendants argue that Mr. Moyes effectively terminated the AFP Agreement on October 22, 2014 when he sent an email to Stewart Hughes that provided, in relevant part: "please threat this email as my resignation from the AFP position." (ECF No. 132 at 21–22.) In response to this argument, Unicity points to Mr. Moyles' deposition wherein he admits that after this purported resignation he continued to receive AFP payments and did not reject those payments. (*See* ECF No. 115-18 at 323.[3]) Based on Mr. Moyles' acceptance of the AFP payments, the court agrees with Unicity that Mr. Moyles' "resignation" in October of 2014 did not terminate the AFP Agreement.

4. Contractual Limitations

Defendants argue that "Unicity's contract claims are barred by the one-year statute of limitations stated in Unicity's policies and procedures." (ECF No. 118 at 24.) Here, Defendants rely on two contractual limitation provisions contained in Unicity's Policies and Procedures. (*See* ECF No. 118 at 26–27.) The first provides: "No legal action may be brought, or damages awarded, more than one year after the event giving rise to the cause of action has occurred, not withstanding any other statute of limitations provision." (ECF No. 118 at 26–27 (emphasis removed) (citation omitted). The second provides: "No legal action may be brought by either party to this Distributor Agreement more than one year after the event giving rise to the cause of action has occurred." (ECF No. 118 at 27.)

---

[3] Q. Between the date of this letter and 2016, when your payments were terminated, did you receive other AFP payments?
A. Yes.
Q. Did you reject those payments, since you claim now this was your resignation?
 A. I did not.

Unicity makes two arguments in response. First, it argues that the "one-year limitation provision in the Distributor Agreement . . . is an affirmative defense that [Defendants] failed to plead." (ECF No. 134 at 19.) Second, Unicity argues, in the alternative, that "[s]hould the court disagree with Unicity's argument that [Defendants] waived their contractual limitation defense, Unicity acknowledges there is a question of fact as to when the one-year limitation period began to run." (ECF No. 141 at 11.) The court addresses each argument in turn.

   a.   Defendants Did Not Waive Their Contractual Limitation Defense

Unicity argues that "[w]hat constitutes an affirmative defense to a state law cause of action in a diversity case is a question of state substantive law under the *Erie* doctrine, meaning a federal court sitting in diversity must apply state law in answering that question." (ECF No. 134 at 19.) Unicity argues that a contractual limitation defense is distinct from a statute of limitation defense under Utah law, and argues that Defendants waived their contractual limitation defense by failing to specifically plead it as an affirmative defense in their answer. (*See* ECF No. 134 at 18.)

The court agrees with Unicity that a contractual limitation defense is distinct from a statute of limitations defense under Utah law. *See Creekview Apartments By & Through Hedman Investments, Inc. v. State Farm Ins. Co.*, 771 P.2d 693, 695 (Utah Ct. App. 1989) ("The statute of limitations is specifically listed as an affirmative defense under Rule 8(c); 'contractual limitation' is not so specified."). And the court agrees generally that "[i]n a diversity case, substantive state law determines what constitutes an affirmative defense." *LSREF2 Baron, L.L.C. v. Tauch*, 751 F.3d 394, 398 (5th Cir. 2014). But, importantly here, "the Federal Rules of Civil Procedure"—not state law—"provide the manner and time in which defenses are raised and

*when waiver occurs*." *Smith v. R.J. Reynolds Tobacco Co.*, 880 F.3d 1272, 1280–81 (11th Cir. 2018) (emphasis added).

Defendants argue that they "did not waive their right to assert a defense based on the one-year limitations provision." (ECF No. 140 at 6.) "In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense . . . ." Fed. R. Civ. P. 8(c)(1). "A failure to raise an affirmative defense under Rule 8(c) generally results in a waiver of that defense." *Adema Techs., Inc. v. Eiffert*, No. 13-CV-01139-CMA-NYW, 2015 WL 5244722, at *2 (D. Colo. Sept. 9, 2015). But, as Defendants argue "in considering this rule, [this court] must keep in perspective that 'the liberal pleading rules established by the Federal Rules of Civil Procedure apply to the pleading of affirmative defenses.'" *Creative Consumer Concepts, Inc. v. Kreisler*, 563 F.3d 1070, 1076 (10th Cir. 2009) (citations omitted). This court must focus on the actual purpose of Rule 8 in deciding whether Defendants waived their contractual limitation defense. *See id.* ("Therefore, 'we must avoid hypertechnicality in pleading requirements and focus, instead, on enforcing the actual purpose of the rule.'"). As the Tenth Circuit has instructed:

> Rule 8(c)'s ultimate purpose is simply to guarantee that the opposing party has notice of any additional issue that may be raised at trial so that he or she is prepared to properly litigate it. When a plaintiff has notice that an affirmative defense will be raised at trial, the defendant's failure to comply with Rule 8(c) does not cause the plaintiff any prejudice. And, when the failure to raise an affirmative defense does not prejudice the plaintiff, it is not error for the trial court to hear evidence on the issue.

*Kreisler*, 563 F.3d at 1076 (internal quotation marks and citation omitted).

Defendants argue that Unicity had notice of the contractual limitation defense because, "as the party that drafted and incorporated" the contracts, it had knowledge of the content of its own contracts. (*See* ECF No. 140 at 8.) The court agrees that Unicity, as the party who drafted

the contracts, had knowledge of its contents—including the contractual limitation provision. Keeping in mind the liberal pleading rules established by the Federal Rules of Civil Procedure, and the purpose of Rule 8(c), this court holds that Defendants did not waive their contractual limitation defense because Unicity had notice of the defense based on their knowledge of the contracts' contents. *C.f. Jones v. Miles*, 656 F.2d 103, 108 (5th Cir. 1981) ("[I]n practice an affirmative defense is not waived to the extent that . . . the opposing party's own evidence discloses the defense . . . .").

   b. <u>Undisputed Facts Demonstrate that Unicity's Contract Claims are Barred by the One Year Contractual Limitation Provision</u>

In their opening affirmative motion, Defendants initially argue that "Unicity's *contract* claims are barred by the one year statute of limitations stated in Unicity's Policies and Procedures." (ECF No. 118 at 24 (emphasis added); *see also* ECF No. 118 at 2)). But Defendants later argue that "*all* of Unicity's claims against Defendants should be dismissed with prejudice and as a matter of law" because "Unicity's claims were clearly time barred by the one year statute of limitations which Unicity had imposed on itself and its distributors in its Policies and Procedures." (ECF No. 118 at 32 (emphasis added).) Defendants' arguments related to its contractual limitation defense largely center on Unicity's breach of contract claims—not its fraud claims.[4]

Because the contractual limitation defense is an affirmative defense, because it is unclear whether Defendants argue that all of Unicity's claims are barred by the contractual limitation or

---

[4] (*See* ECF No. 118 at 27 ("These two provisions in Unicity's Policies and Procedures are applicable to all of the alleged written agreements between Unicity and Defendants, including the Distributor Agreement, the RMA, and the AFP, and are very clear in requiring that any claims between the parties be initiated within ***one year*** of when the events giving rise to the cause of action occurred.") (emphasis in original).)

just the contract claims, and because Defendants' arguments focus on the contract claims, this court declines to consider whether the contractual limitation provision bars Unicity's fraud claims.[5]

Defendants argue that because "Unicity initiated this lawsuit with the filing of its original Complaint on July 8, 2016," "Unicity's [contract] claims must have arisen after July 8, 2015." (ECF No. 118 at 27.) Defendants argue that "there is no question that Unicity's causes of action arose prior to July 8, 2015." (ECF No. 118 at 27.) In its Opposition, Unicity argues that "a genuine dispute exists as to when Unicity discovered, or reasonably should have discovered, the facts giving rise to its contract claims . . . ." (ECF No. 134 at 28.) As explained below, even when viewing the evidence in the light most favorable to Unicity, the court agrees that the undisputed facts demonstrate that the one-year contractual limitation provision bars Unicity's contract claims.

Unicity argues, and Defendants do not dispute, that "Utah law governs the interpretation of the one-year limitation provision in Unicity's Distributor Agreement and its Policies and Procedures." (ECF No. 134 at 24.) Both parties agree that Utah's precedent discussing accrual rules related to statute of limitations applies equally to contractual limitations. (*Compare* ECF No. 134 at 24–29 *with* ECF No. 140 at 10–12.) Thus, Utah caselaw discussing accrual rules related to statute of limitations is applicable to this case.

In Utah, "[a]s a general rule, a statute of limitations begins to run 'upon the happening of the last event necessary to complete the cause of action.'" *Russell Packard Dev., Inc. v. Carson*,

---

[5] Based on the arguments presented, the court would hold that Defendants are not entitled to prevail on their affirmative contractual limitation defense to thwart Unicity's tort claims. Defendants have not made the necessary showing to be entitled to that relief.

108 P.3d 741, 746 (Utah 2005). "Once a statute has begun to run, a plaintiff must file his or her claim before the limitations period expires or the claim will be barred." *Id*. "Mere ignorance of the existence of a cause of action will neither prevent the running of the statute of limitations nor excuse a plaintiff's failure to file a claim within the relevant statutory period." *Id*.

But the Utah Supreme Court has "acknowledged two narrow settings in which a statute of limitations may be tolled until the discovery of facts forming the basis for the cause of action." *Id*. (internal quotation marks and citation omitted). The Utah Supreme Court refers to the first of these two settings as the "statutory discovery rule" and the second of these settings as the "equitable discovery rule." *See id*. at 746–47. Relevant here is the equitable discovery rule. The Utah Supreme Court has

> limited the circumstances in which an equitable discovery rule may operate to toll an otherwise fixed statute of limitations period to the following two situations: (1) where a plaintiff does not become aware of the cause of action because of the defendant's **concealment** or misleading conduct, and (2) where the case presents exceptional circumstances and the application of the general rule would be irrational or unjust, regardless of any showing that the defendant has prevented the discovery of the cause of action.

*Carson*, 108 P.3d at 747 (bold added) (internal quotation marks and citation omitted).

Unicity relies on the concealment version of the discovery rule. (*See* ECF No. 134 at 25.) Unicity argues that "[t]he concealment version of the discovery rule tolled the running of the limitation period because [Defendants] concealed the facts underlying Unicity's causes of action against them . . . ." (ECF No. 134 at 25.) But "before a statute of limitations may be tolled under" the concealment version of the discovery rule, "the plaintiff must make an initial showing that he did not know nor should have reasonably known the facts underlying the cause of action in time

to reasonably comply with the limitations period." *Berneau v. Martino*, 223 P.3d 1128, 1134 (Utah 2009). "The determination of the initial showing is a question of fact." *Id*.

As explained below, Defendants have presented undisputed evidence that Unicity had actual knowledge—prior to July 8, 2015—that Jim Moyles was violating the terms of the AFP Agreement. Because Unicity knew, prior to July 8, 2015, that Jim Moyles was violating the AFP Agreement, Unicity cannot, as it must, make the necessary initial showing that it did not know of facts underlying its contract claims. Thus, the one year contractual limitation provisions—as they relate to Unicity's contract claims—are not tolled.

Defendants argue that "Unicity's [contract] claims against Defendants are based entirely on allegations that Moyles was improperly working as a Jusuru distributor when Unicity contends that Moyles' was prohibited under the terms of the RMA and AFP from having any involvement in any other network marketing companies besides Unicity." (ECF No. 118 at 27.) Unicity agrees that its "contract claims largely revolve around Moyles and [First Florida's] enrollment and operation of two Jusuru distributorships." (ECF No. 134 at 25.)

Defendants argue that the contractual limitation provision bars Unicity from bringing its contract claims because "Unicity was aware of Moyles' involvement in Jusuru and believed he had violated the terms of his agreements with Unicity long before July 8, 2015." (ECF No. 118 at 28.) Defendants cite five categories of evidence that they argue demonstrate, as a matter of law, that Unicity discovered or should have discovered the facts underlying their contractual claims before the limitations period expired:

(1) a January 13, 2012 letter from Unicity's Compliance Department which provided that Mr. Moyles "may be participating in activities that are in violation of the [AFP];" (2) a

September 30, 2014 email and October 22, 2014 reply email in which Mr. Moyles (a) represents that his daughter is a Jusuru distributor, (b) asks for permission from Unicity CEO Stewart Hughes to help his daughter grow her business, and (c) attempted to resign from the AFP position; **(3)** a January 17, 2015 email in which Mr. Moyles inadvertently cc'd an Unicity employee on an email that referenced his involvement in Jusuru meetings and that Unicity employee's January 19, 2015 email forwarding Mr. Moyles' email to another Unicity employee in which she suspects that Mr. Moyes may be involved "in another MLM;" **(4)** a March 4, 2015 draft letter[6] from Unicity's Compliance department (a) indicating that Unicity believed Mr. Moyles' "involvement in promoting this competing opportunity [with Jusuru] [was] in violation of [Mr. Moyles'] AFP Agreement," but (b) also indicating that Unicity would not take any "further disciplinary action" because, based on a telephone conversation with Mr. Moyles, it was understood that he would "maintain a minimal presence in Jusuru;" and **(5)** a December 16, 2015 email from an Unicity executive that provided, in relevant part, that Mr. Moyles had "been violating his agreement for a long time," and provided that there had been a "record of complaints going back three years at least." (ECF No. 118 at 29–31.)

The court discusses the third and fourth categories of evidence in more detail, as they are the most relevant to the present dispute.

<u>January 17, 2015 Email</u>

On January 16, 2015, an individual named Richard Moss sent an emailed to an individual named Greg. (ECF No. 117-16 at 1.) Jim Moyles was cc'd on this email. (ECF No. 117-16 at 1.)

---

[6] Defendants concede that this letter may not have been sent to Mr. Moyles

The subject line of the email provided: "Let's start some Jusuru meetings at your home in South

Tampa?" (ECF No. 117-16 at 1.) The email provided, in relevant part:

> It was a pleasure meeting you and your commercial real estate friend today at the
> noon *Jusuru meeting at Jim Moyles offices*. It would be great to start a great group
> of Jusuru Distributors in South Tampa. I did mention a very good potential
> prospect Krone Weidler of Marcus & Millichap. She lives in South Tampa and
> knows a lot of folks that want to "look and feel" their very best and she is already
> very financially successful with her real estate company, but busy folks make
> great leaders. Let me know when we can put together a South Tampa group,
> *similar to the Palm Beach Jusuru Group that Jim Moyles put together that is
> leading the Jusuru sales volume at this time.*

(ECF No. 117-16 at 1 (emphasis added).) On January 17, 2015, Mr. Moyles sent an email to an

individual named Greg and a Unicity employee, Lori Storey. (ECF No. 117-16 at 1.) That email

provided: "Great it will be nice to include Rick but our primary focus needs to be [to] put

together your team of five people and getting the two best and brightest launched. Jim[.]" (ECF

No. 117-16 at 1.) On January 19, 2015, that Unicity employee sent an email to Kara Miller that

provided: "This was really weird . . . I got an email from Jim Moyles. Sounds like he is also in

another MLM? I don't know if --that's a problem or not." (ECF No. 117-16 at 1.)

<u>March 4, 2015 Draft Letter</u>

Both parties agree that Kara Miller drafted a letter in March of 2015 that was not sent to

Mr. Moyles. The draft letter was regarding the "AFP Contract." (ECF No. 117-17 at 1.) The draft

letter provided:

> Dear Jim:
>
> As a leader, you understand the importance of following the Policies and
> Procedures and conducting your Distributorship in an ethical manner. Recently, it
> was brought to our attention that you contacted Unicity employees regarding a
> meeting being held for Jusuru, a competing network marketing company. We
> recognize that while you have not engaged in any Cross-Sponsoring activities,
> *your involvement in promoting this competing opportunity is in violation of your*

> *Additional Franchise Position (AFP) Agreement.* Unicity desires to ensure that your actions do not [a]ffect or undermine your Unicity organization. As a reminder, you agreed to the following when entering into your AFP Agreement:
>
> "I have read and agree to the requirements and rules as stated above. I also agree that for this special consideration, I will not participate directly or indirectly in any other direct selling, network marketing, or multi-level opportunity for as long as I have the Additional Franchise Position and six (6) months following the termination of this position.["]
>
> The issue[] raised is a *violation of your AFP Agreement and the Unicity Policies and Procedures* and would normally warrant action against your Distributorship. However, per our telephone conversation, it has been agreed that we will not pursue any further disciplinary action at this time with the understanding you will take appropriate precautions to maintain a minimal presence in Jusuru and that your involvement will not affect our valued Unicity Distributors.
>
> Sincerely,

(ECF No. 117-17 at 1 (emphases added).) The draft letter was not signed.

When considered together, the information contained in the January 17, 2015 email and the March 4, 2015 draft letter establish that Unicity knew, or reasonably should have known of, the facts underlying their contract causes of action in time to reasonably comply with the one year contractual limitations period. The January 17, 2015 email put Unicity on notice that Mr. Moyles "put together" a "Palm Beach Jusuru Group" that was "leading the Jusuru sales volume at [that] time." (ECF No. 117-16 at 1.) The Additional Franchise Position Agreement prohibited Mr. Moyles from "participat[ing] directly or indirectly in any . . . direct selling, networking marketing, or multi-level opportunity for as long as [he had] the Additional Franchise Position . . . ." (ECF No. 115-32 at 1.) The Unicity employee's January 19, 2015 email to Kara Miller provides undisputed evidence that Unicity knew that Jusuru was a multilevel marketing company. (*See* ECF No. 117-16 at 1 ("Sounds like he is also in another **MLM** . . . ." (bold added).) And finally, Kara Miller's draft letter provides undisputed evidence that Unicity knew,

as of March 4, 2015, that Mr. Moyles' involvement with Jusuru was "in violation of [his]

Additional Franchise Position . . . Agreement." (ECF No. 117-17 at 1.)

 In short, Unicity knew well before July 8, 2015 that (1) Mr. Moyles had put together a

Jusuru team that was leading in sales; (2) that Jusuru was a multi-level marketing company, and

(3) that Mr. Moyles was in violation of the AFP Agreement. Because these are the facts

underlying Unicity's contract claims, Unicity cannot make the required showing that it "did not

know nor should have reasonably known the facts underlying the cause of action in time to

reasonably comply with the limitations period." *Berneau*, 223 P.3d at 1134–35. This showing is

a prerequisite to the tolling of the contractual limitations provision. Because Unicity cannot make

the required showing, the contractual limitations provision, as it relates to the contract claims, is

not tolled.  The court agrees with Defendants' that Unicity's contract claims arose prior to July 8,

2015. Thus, Unicity's contract claims are barred by the two contractual limitation provisions

contained in Unicity's Policies and Procedures.[7]

 Unicity's three breach of covenant of good faith and fair dealing claims are each tied to

its respective contract claims.[8] The Utah Supreme Court has "consistently rejected the notion of

---

[7] Each of Unicity's breach of contract claims are premised on Mr. Moyles' involvement with Jusuru. Unicity alleges [1] that Defendants breached the distributor agreement "through their conduct . . . in connection with the distributorships Moyles established at Jusuru (2nd Am. Compl. ¶ 103, ECF No. 81 at 33;) [2] that Defendants breached the RMA "through their conduct . . . in connection with the distributorships Moyles established at Jusuru (2nd Am. Compl. ¶ 111, ECF No. 81 at 34;) and [3] that Defendants breached the AFP Agreement "through their conduct" "in connection with the distributorships Moyes established at Jusuru . . . ." (2nd Am. Compl. ¶ 118, ECF No. 81 at 35.)

[8] [1] (*See* 2nd Am. Compl. ¶ 126, ECF No. 81 at 37) ("Moyles and First Florida breached the implied covenant of good faith and fair dealing in the Distributorship Agreement through their conduct. . . alleged herein in connection with the distributorships Moyles established at Jusuru . . . .");) [2] (*See* 2nd Am. Compl. ¶ 135, ECF No. 81 at 38) ("Moyles and First Florida breached the implied covenant of good faith and fair dealing in the 2007 RMA through their conduct . . . alleged herein in connection with the distributorships Moyles established at Jusuru . . . .") [3] (*See* 2nd Am. Compl. ¶ 143, ECF No. 81 at 38) ("Moyles and First Florida breached the implied covenant of good faith and fair dealing in the AFP Agreement through their conduct . . . alleged herein in connection with the distributorships Moyles established at Jusuru . . . .").)

a free-standing implied covenant of good faith and fair dealing in the absence of a contract. *Tomlinson v. NCR Corp.*, 345 P.3d 523, 531 (Utah 2014). "And the implied covenant cannot 'establish new, independent rights or duties not agreed upon by the parties.'" *Id*. (citations omitted). Because a claim for breach of the implied covenant cannot establish new rights not agreed to by the parties, because the parties agreed to a one year contractual limitation provision, because the contractual limitation provision bars each of Unicity's contract claims, and because each of the implied covenant claims is tied to barred contract claims, each of Unicity's implied covenant claims is barred.

To summarize, Unicity's first, second, third, fourth, fifth, and sixth claims are all barred by the one year contractual limitation provisions. The court GRANTS Defendants' Motion for Summary Judgment seeking judgment as a matter of law that Unicity's contract claims and related implied covenant claims are barred by the one year contractual limitations provisions. The court DENIES Unicity's Motion for Summary Judgment seeking entry of judgment on its claims against Moyles and [First Florida] for breach of the Distributor Agreement and the AFP Agreement.

II.   <u>Defendants' Damages Argument</u>

As discussed above, the court agrees with Defendants that Unicity's contract claims and related implied covenant claims are barred by the one year contractual limitation provision. But Defendants argue that "[e]ach of Unicity's claims for relief . . . including the fraud claim, negligent misrepresentation claim, and the unjust enrichment claim, require a showing that Unicity sustained actual damages in order to prevail on any of those claims." (ECF No. 118 at 33.) Defendants argue that "Unicity cannot show that it sustained any damages as a result of

Defendants' alleged conduct that gives rise to [those] [c]laims . . . and therefore, [those] claims should all be dismissed as a matter for law since they cannot satisfy this required element." (ECF No. 118 at 33.)

In response, Unicity argues that "[t]he commission that Moyles and [First Florida] admit Unicity paid to [First Florida] . . . serve as a basis for establishing the amount of Unicity's damages on its fraud and negligent misrepresentation claims." (ECF No. 134 at 38.) Unicity argues that "Unicity's continued payment of commissions to [First Florida]—money that Unicity would have ben contractually entitled to retain had it suspended or terminated Moyles and [First Florida] in January 2012—was a reasonably foreseeable consequence of Unicity's reliance on Moyles' representations." (ECF No. 134 at 39.) Equally as important, Unicity argues that "terminated distributorships become the property of Unicity and can remain in the same genealogical distributorship position they held before termination." (ECF No. 151 at 23; *see also* ECF No. 115-2 at 34 ("Terminated Distributorships are the property of Unicity and may remain in the current Unicity Genealogical Distributorship position and will be managed, maintained, sold or disposed of by Unicity, at its sole discretion."); *see also* ECF No. 115-2 at 34 ("In addition, a terminated Distributor loses all rights to the existing Downline and is no longer entitled to receive any Awards whatsoever, already earned or otherwise . . . .").)

Unicity argues that "[u]nder Florida or Utah law, Unicity may recover as out-of-pocket or consequential damages on its fraud claim the amount of money it paid in commissions to [First Florida] in reliance on the false representations Moyles made in January 2012, September 2014, and October 2014." (ECF No. 151 at 24.) The court agrees that because Unicity was entitled to terminate Defendants' Distributorships if Defendants had breached the terms of the AFP

Agreement and related agreements, because Unicity would be entitled to all profits generated

from those terminated Distributorships, and because Unicity would not have had to pay

commissions to Mr. Moyles if it had terminated the Distributorships, "[t]he commission that

Moyles and [First Florida] admit Unicity paid to [First Florida] [may] serve as a basis for

establishing the amount of Unicity's damages on its fraud and negligent misrepresentation

claims." (ECF No. 134 at 38.)

Defendants have not demonstrated that they are entitled to judgment as a matter of law

that "Unicity did not sustain any damages as a result of Defendants' alleged conduct." (ECF No.

118 at 33.) The court DENIES this portion of Defendants' Motion for Summary Judgment. (*See*

ECF No. 118 at 33–37.)

III.     Unicity's Motion for Partial Summary Judgment on its Fraud Claim

Having decided that Defendants are not entitled to judgment as a matter of law that

Unicity's fraud claim should be dismissed, the court proceeds to consider Unicity's motion for

partial summary judgment on its fraud claim.

Unicity argues that "[p]roving the defendant knowingly made a false representation

concerning a presently existing material fact is a requirement for establishing a fraud claim under

either Utah or Florida law, so the court need not at this time determine which state's law applies

to grant the partial summary judgment requested by Unicity on this claim." (ECF No. 116 at 34.)

The court agrees. Unicity seeks a determination as a matter of law that Moyles and First Florida

made false representations of presently existing material facts to Unicity in (A) 2012 and (B)

2014. (ECF No. 116 at 34.)

A. 2012

On January 13, 2012, Kara Miller sent a letter to Mr. Moyles that provided, in relevant

part, that Unicity had "received reports that [Mr. Moyles] may be involved in a competing

network marketing opportunity with Jusuru." (ECF No. 115-33 at 2.) Ms. Miller also quoted a

portion of the AFP Agreement, which provided, in relevant part "'I will not participate directly

or indirectly in any other direct selling, network marketing, or multi-level opportunity . . . .'"

(ECF No. 115-33 at 2.)

On January 19, 2012, Mr. Moyles responded:

Dear Kara,

Thank you for your letter of January 13, 2012. I can assure you that I am not a
distributor of Jusuru or any network marketing company other than Unicity.

To be candid, my daughter, Ashley Germain, is a distributor in that company and
while I have given her counsel and advice as any father would, and her brother
and I have even made the conference room in our office available to her, I have
received no remuneration or profited in any way from her or anyone else in the
company.

As you know, I have taken a great deal of pride in building one of your largest
groups and I would not do anything to undermine any distributor in my
organization or that company.

Sincerely,

Jim Moyles

(ECF No. 115-35 at 1.)

Unicity argues that Mr. Moyles' email "grossly misrepresented Moyles and [First

Florida's] actual involvement with Jusuru between June 2, 2010, and January 19, 2012." (ECF

No. 116 at 35.)

Unicity argues:

As Moyles and FFBC well knew, Moyles had done far more with respect to Jusuru than just giving fatherly counsel and advice to Ashely and making FFBC's conference room available to her. Moyles, not Ashley, was predominantly (if not exclusively) responsible for all actions a distributor would normally undertake. Moyles has admitted under oath that as of January 19, 2012, he was soliciting individuals to Jusuru for the Ashley and DRI distributorships, holding regular Jusuru business opportunity meetings at FFBC's office that were not attended by Ashley or Sean (as opposed to merely making the conference room at that office available to Ashley), conducting regular training sessions and preparing training manuals for the Jusuru distributors in Ashley and DRI's downlines, making PowerPoint presentations for the Jusuru distributors in Ashley and DRI's downlines, attending Jusuru events in West Palm Beach, participating in Jusuru's Presidential Circle, participating in direct phone calls with Jusuru's president, attending Jusuru's annual conventions (and had even presented at one of them), and tasking FFBC's employees with assisting in the operation of the Ashley and DRI Jusuru distributorships. Conspicuously absent from Moyles' description of his involvement with Jusuru is the fact that, only a few months earlier, he had negotiated the creation of the DRI Jusuru distributorship and its placement upline to Ashley's Jusuru distributorship. Moyles' omission of these key facts that were clearly responsive to Unicity's inquiry about whether he was involved with Jusuru conveyed the false impression that Moyles had no involvement beyond counseling and advising Ashley and making FFBC's conference room available to her—which Moyles and FFBC knew was not true.

(ECF No. 116 at 35 (internal quotation marks omitted).) Assuming without deciding that, as Unicity argues, the governing law allows a claim for fraud to be premised on "silence where there is a duty to speak or by half-truths calculated to mislead," (ECF No. 141 at 21 (citation omitted),) the court agrees that Mr. Moyles' January 19, 2012 email constituted a fraudulent misrepresentation.

B. <u>2014</u>

On September 30, 2014, Mr. Moyles sent an email to Stewart Hughes that provided, in relevant part:

As I mentioned; at this stage of my life, I'd like to be as involved as much as I can be with my children. My sons are all doing great but quite frankly my daughter is magical and being with her is one of my greatest joys.

36

> As you know; she is a Jusuru distributor. She loves their skin care products and their plan and would like my help in growing her business. Can I have your okay on this? I realize this would conflict with the AFP position. The income from the AFP is small and I am willing to give that up if you prefer.

(ECF No. 115-34 at 2.)

Unicity argues that "[t]he unmistakable impression conveyed by Moyles to Unicity in his request for permission to begin helping Ashley grow her Jusuru business was the representation that he was not already helping her or other Jusuru distributors grow their Jusuru business." (ECF No. 116 at 37.) Unicity argues that "[t]hat representation was indisputably false." (ECF No. 116 at 37.) Citing Mr. Moyles' deposition testimony, Unicity argues that "Moyles has admitted under oath that when he wrote this email, he had already been assisting Ashley with her Jusuru distributorship for four years." (ECF No. 116 at 37 (citing ECF No. 115-18 at 308–313.) The following line of questioning did occur at Mr. Moyles' deposition:

> Q. And you knew that [the AFP] agreement, when you signed it, prohibited you from participating with her in developing her Jusuru line, correct? You knew that?
>
> A. Basically, yes.
>
> Q. And you didn't ask for any permission until four years later, four years after she became involved at Jusuru, five years after you signed the agreement?
>
> A. That's correct.

(ECF No. 115-18 at 315.)

Assuming without deciding that, as Unicity argues, the governing law allows a claim for fraud to be premised on "half-truths calculated to mislead," the court agrees that Mr. Moyles' September 30, 2014 email constituted a fraudulent misrepresentation because Mr. Moyles had already been assisting her daughter with Jusuru for four years.

IV.    Unicity is Entitled to Summary Judgment on First Florida's Counterclaim for Breach
       of Contract and Breach of Covenant of Good Faith and Fair Dealing

"Unicity seeks summary judgment in its favor on First Florida's counterclaims for breach

of the Distributor Agreement and the covenant of good faith and fair dealing." (ECF No. 16 at

38.)

A.   First Florida's Breach of Contract Counterclaim

In its Amended Counterclaim, First Florida alleges that "Unicity breached the

Distributorship Agreement by terminating First Florida's Distributorship Agreement without

cause, and by failing to pay commissions due and owing to First Florida as were agreed to under

the compensation plan set forth in the Distributorship Agreement." (ECF No. 70 at 16.)

Unicity argues that First Florida "cannot prove that it performed its obligations under the

Distributor Agreement or that Unicity materially breached the Distributor Agreement." (ECF No.

116 at 39.) "[P]erformance by the party seeking recovery" is an essential element of Defendants'

breach of contract counterclaim. *Am. W. Bank Members, L.C. v. State*, 342 P.3d 224, 230 (Utah

2014). Unicity argues that Defendants cannot prove First Florida's performance because "the

undisputed facts in this case demonstrate that [First Florida] materially breached the Distributor

Agreement beginning in June 2010 through its participation in Jusuru." (ECF No. 116 at 39.) The

court agrees.

Unicity argues that "[o]verwhelming and undisputed evidence in this case conclusively

establishes that from June 2010 through at least sometime in early 2016, Moyles and [First

Florida] participated directly or indirectly in Jusuru, a direct selling, network marketing, or

multi-level marketing company." (ECF No. 116 at 26.) Unicity argues that Defendants'

participation with Jusuru "constituted a material breach of their promise to Unicity in the

[Additional Franchise Participation] agreement that they would not 'participate directly or indirectly in any other direct selling, network marketing, or multi-level opportunity' for so long as they had the [Additional Franchise Participation] distributorship and for six month following the termination of that additional distributorship." (ECF No. 116 at 26.) Unicity also argues that Defendants' participation with Jusuru constituted "a material breach of the Distributor Agreement, which required Moyles and [First Florida] to comply with all of their other 'contractual obligations' to Unicity, and expressly stated that any material breach of another agreement with Unicity (such as the AFP agreement) constituted grounds for termination of Moyles and [First Florida's] Distributor Agreement." (ECF No. 116 at 27.)

Unicity details seven ways Defendants "directly or indirectly participated in Jusuru" between June 2010 and January 2016:

- "First, Moyles participated in setting up two Jusuru distributorships: one that was originally placed in the name of his daughter, Ashley, and later transferred to Hi Beautiful; and another that was placed in the name of DRI. Moyles directed Wise, an existing Jusuru distributor, to complete the online enrollment application for the Ashley Jusuru distributorship on June 2, 2010, telling Wise what information to include on the application." (ECF No. 116 at 27.)
- "Second, Moyles and [First Florida] actively participated in the recruitment of new Jusuru distributors, which Moyles has admitted under oath is a violation of the AFP agreement." (ECF No. 116 at 28.)
- "Third, Moyles and [First Florida] actively participated in the training and ongoing support of Jusuru distributors—activities Moyles has admitted under oath violated the AFP agreement." (ECF No. 116 at 29.)
- "Fourth, Moyles participated in high-level leadership committees formed by Jusuru and regularly communicated with Jusuru officers and employees as part of his effort to grow the Jusuru business. Moyles was a member of Jusuru's Presidential Circle—an honor

reserved for Jusuru's top distributors—and on multiple occasions he provided advice and suggestions on revisions to Jusuru's compensation plan."(ECF No. 116 at 30.)

- "Fifth, Moyles attended each of Jusuru's annual "Rise to Enterprise" conventions from 2011 through 2015, participated in events at those conventions reserved for Jusuru's top distributors, and made presentations—including appearing on the main stage at Jusuru's September 2014 convention to endorse Jusuru as a company and its new compensation plan." (ECF No. 116 at 30.)

- "Sixth, Moyles placed product orders for various Jusuru distributors. At the end of each month, Moyles would access the online account for the Ashley, Hi Beautiful, and DRI Jusuru distributorships; use his credit card to force qualify those distributorship and other distributorships in the downline for commission payments by buying Jusuru product on those distributors' accounts; and then get reimbursed by the Ashley, Hi Beautiful, and DRI Jusuru businesses for those purchases, even though Moyles or FFBC received and used the product being purchased." (ECF No. 116 at 31.)

- "Seventh, Moyles and FFBC each received monetary compensation for their efforts to assist the Ashley, Hi Beautiful, and DRI Jusuru distributorships." (ECF No. 116 at 31.)

The court agrees with Unicity that there is no genuine dispute that Moyles and First Florida's participation in Jusuru constituted a breach of the Additional Franchise Position Agreement's provision requiring them to "not participate directly or indirectly in any other direct selling, network marketing, or multi-level opportunity." (ECF No. 115-32.) By breaching the Additional Franchise Position Agreement, Defendants also breached the Distributor Agreement, which required Moyles and First Florida to comply with all of their other "contractual obligations" to Unicity. The court holds, as a matter of law, that Moyles and First Florida materially breached both the Additional Franchise Position Agreement and the Distributor Agreement through their participation in Jusuru.

Because Defendants breached these agreements, First Florida "cannot genuinely dispute that it failed to perform its obligation under the Distributor Agreement . . . ." (ECF No. 116 at 40.) The court agrees that this failure to perform precludes First Florida from recovering on its breach of contract counterclaim. The court GRANTS summary judgment in Unicity's favor on First Florida's breach of contract counterclaim.

B.  First Florida's Breach of Covenant of Good Faith and Fair Dealing

In its Amended Counterclaim, First Florida alleges that "Unicity breached the implied covenant of good faith and fair dealing in the Distributorship Agreement by terminating First Florida's Distributorship Agreement without cause, and by failing to pay commissions due and owing to First Florida as were agreed to under the compensation plan set forth in the Distributorship Agreement." (ECF No. 70 at 17.) The court agrees with Unicity that the terms of the Distributor Agreement permitted Unicity to terminate First Florida's distributorship as a result of its material breach of the nonparticipation clause in the AFP agreement. Because Unicity's actions complied with the terms of the contract, the court GRANTS summary judgment in Unicity's favor on First Florida's breach of covenant of good faith and fair dealing counterclaim.

V.  Unicity is Entitled to Summary Judgment on First Florida's Counterclaim for Declaratory Relief

In its Amended Counterclaim, First Florida argues that it is "entitled to an order from the court declaring and adjudicating that the Distributorship Agreement does not permit Unicity to disgorge commissions already paid to distributors as doing so would constitute a claim of unjust enrichment; i.e., it would render inequitable Unicity's retention of all the benefits derived from the Distributorship Agreement without any benefit to First Florida." (ECF No. 70 at 18.)

Unicity argues that "[g]iven the commissions Unicity paid to [First Florida] is an appropriate measure of its damages on its . . . fraud claims, the court should enter summary judgment on [First Florida's] declaratory relief claim denying [First Florida] the declaratory judgment it seeks." (ECF No. 116 at 45.) In opposition, Defendants refer the court to "Section I.D. of [their] argument . . . which pertains to Unicity's claim for 'reliance damages.'" (ECF No. 132 at 36.) As Unicity points out in Reply, Defendants did not "even attempt to dispute in its opposition" that "Unicity can . . . recover the value of [the] commissions as damages on its fraud claim . . . ." (ECF No. 141 at 25.) Unicity had argued that it could "recover as damages on its fraud claim the expenditures it made as a result of the fraud." (ECF No. 116 at 45 (citing *Ong Int'l (U.S.A.) Inc. v. 11th Ave. Corp.*, 850 P.2d 447, 457 (Utah 1993).[9])

The court agrees that commissions Unicity paid to First Florida as a result of fraudulent misrepresentations is a proper measure of Unicity's damages for its fraud claim. Therefore, the court GRANTS summary judgment in Unicity's favor denying First Florida's declaratory relief counterclaim.

VI.     Unicity's Unjust Enrichment Claim

Defendants argue that "Unicity cannot pursue unjust enrichment claims against Defendants because Utah law precludes unjust enrichment claims when there is a contract in place that governs the conduct at issue." (ECF No. 118 at 37.) "[A] prerequisite for recovery on an unjust enrichment theory is the absence of an enforceable contract governing the rights and obligations of the parties relating to the conduct at issue." *Ashby v. Ashby*, 227 P.3d 246, 250

---

[9] *Ong Int'l (U.S.A.) Inc. v. 11th Ave. Corp.*, 850 P.2d 447, 457 (Utah 1993) ("Other available consequential damages include expenses resulting from fraud . . . .")).

(Utah 2010). "If there were a contract, it, rather than the law of restitution, would govern the parties' rights and determine their recovery." *Id*. at 250–51. The court agrees with Defendants that because express contracts cover Unicity's breach of contract claims, recovery for unjust enrichment is unavailable. The court GRANTS Defendants' Motion for Summary Judgment dismissing Unicity's ninth Claim for Relief, unjust enrichment.

VII.   The Court Need Not Address Defendants' Specific RMA Arguments

Defendants argue that "Unicity's Contract claims based on the RMA should be dismissed because Unicity failed to execute the RMA" and argue that "the RMA would have expired prior to Moyles' alleged Jusuru involvement." (ECF No. 118 at 39–40.) Because the court agrees with Defendants that the one year contractual limitation provision bars Unicity's RMA Breach of contract claim, the court need not address Defendants' arguments.

Conclusion

I.   Defendants' Motion to Strike Unicity's Response to Defendants' Supplemental Brief Regarding Economic Loss Rule, (ECF No. 153) is DENIED.

II.   Unicity's Motion for Summary Judgment, (ECF No. 116) is GRANTED in part and DENIED in part.

   a.   Unicity's Motion for Summary Judgment on its Breach of Contract Claims is DENIED.

   b.   Unicity's Motion for Partial Summary Judgment on its Fraud Claim is GRANTED.

    c. Unicity's Motion for Summary Judgment in its Favor on First Florida's Counterclaims for Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing is GRANTED.

    d. Unicity's Motion for Summary Judgment Denying First Florida's Declaratory Relief Counterclaim is GRANTED.

III.  Defendants' Motion for Summary Judgment, (ECF No. 118) is GRANTED in part and DENIED in part.

    a. Defendants' Motion for Summary Judgment seeking judgment as a matter of law that Unicity's contract claims and related implied covenant claims are barred by the one year contractual limitations provisions is GRANTED.

    b. Defendants' Motion for Summary Judgment seeking to dismiss all of Unicity's claims for lack of damages is DENIED.

    c. Defendants' Motion for Summary Judgment dismissing Unicity's ninth Claim for Relief, unjust enrichment, is GRANTED.

SO ORDERED this 9th day of April, 2021.

BY THE COURT:

Clark Waddoups
United States District Judge